KANSAS PACIFIC RAILWAY CO. V. COMMISSIONERS OF WYANDOTTE COUNTY.

1. PERSONAL-PROPERTY ASSESSMENT; *Who to Fix Value; General Rule.* Under the general tax-law of 1868, the value to be placed upon *personal* property for taxation was in the first instance fixed by the party returning and listing the same, while the state had the right under ₴ 65 of that law, after notice to the party, and inquiry before the county clerk or the commissioners, to have any errors in such valuation corrected.

2. ASSESSMENT OF PERSONAL PROPERTY OF RAILROAD CORPORATIONS — *Under Law of 1874.* The railroad tax-law of 1874 established the same rule in respect to the valuation of railroad property; and the value placed on its personal property by the owner, was to be accepted, unless corrected by proceedings under said ₴ 65.

3. CONSTRUCTION OF STATUTES; *Conflicting Provisions.* Where there is no way of reconciling conflicting clauses of a statute, and nothing to indicate which the legislature regarded as of paramount importance, force should be given to those clauses which would make the statute in harmony with the other legislation on the same subject, and which would tend most completely to secure the rights of all persons and parties affected by such legislation.

4. VOLUNTARY PAYMENT, *Cannot be Recovered Back; What is such Payment.* Where a party pays an illegal demand with a full knowledge of all the facts which render such demand illegal, without an immediate and urgent necessity therefor, or unless to release his person or property from detention, or to prevent an immediate seizure of his person or property, such payment must be deemed to be voluntary, and cannot be recovered back. And the fact that the party at the time of making the payment files a written protest, does not make the payment involuntary.

5. INVOLUNTARY PAYMENT — *When Made to Prevent Issuance of Compulsory Process.* Where all steps for determining the amount of a tax upon personal property have been taken, the tax-roll is complete and in the treasurer's hands, the taxes due, and it is made the duty of the treasurer at a specified date to issue a warrant to the sheriff to collect all unpaid taxes on personal property, and the duty of the sheriff within sixty days thereafter to levy upon and sell sufficient personal property to pay such taxes, penalty, and costs, and no discretion is given to any one to change the amount of the tax, or the time or manner of its collection, a payment to the treasurer of the tax, protesting its illegality, declaring that payment is made solely to avoid the issue of process, and asserting an intention to sue for the sum

illegally paid, should be considered an involuntary payment—one made to prevent an immediate seizure of the taxpayer's property, although such payment was made seventeen days before the time fixed for the treasurer to issue his warrant.

*Error from Wyandotte District Court.*

INJUNCTION, brought by the *K. P. Railway Company*, against the *Board of County Commissioners*, and *E. W. S. Drought* as sheriff, of Wyandotte county, to restrain the collection of alleged illegal taxes. The plaintiff's petition stated, that on the first day of May 1874, plaintiff duly listed for taxation, all its rolling-stock and other personal property, as required by ch. 96, Laws of 1874, p. 147, and returned the same, with a sworn schedule thereof, to the county clerk of said county; that the total length of the main track of plaintiff's railroad in said county was 21 55-100ths miles, and the proportion of value of said rolling-stock, listed as aforesaid, amounted to $1,076.63 per mile; that the aggregate value of plaintiff's personal property so returned for taxation to said county clerk for said year 1874 was $72,653.04; that neither the county clerk nor the board of county commissioners of said county proceeded to correct such statement as false or erroneous, nor did said county clerk notify the plaintiff that he or said county board considered such sworn statement as false, incomplete or erroneous, so that plaintiff might have an opportunity of showing that its statement was correct; nor is there in the office of said county clerk any statement of facts or evidence on which he or said county board have made any correction of plaintiff's sworn statement; that said county clerk illegally entered said property on the tax-roll at the value of $1,555.64 per mile, and so apportioned the same for the purpose of taxation among the different cities, township, school and road districts of his county, thus making an arbitrary and oppressive increase of $479.01 per mile on the value thereof, thus increasing the aggregate value of said property to $82,897.90—being $10,244.86 more than the valuation returned by plaintiff; that the amount of taxes legally imposed on the property so valued and

returned by plaintiff, was $3,608.02; that the amount actually and arbitrarily assessed was $4,562.16, of which the sum of $954.14 was and is illegal, being levied on said illegally-increased valuation made as aforesaid; that, as provided in and by ch. 131, laws of 1874, one-half of said legal taxes was due and payable 20th December 1874, and the other half 20th June 1875; that on the 14th of said December plaintiff tendered to the treasurer of said Wyandotte county $1,804.01, being one-half the legal taxes assessed on plaintiff's personal property, which said treasurer refused; that then, under protest, and to prevent the issuance of a tax-warrant, plaintiff paid said treasurer the sum of $2,281.08, (accompanying such payment with a written protest and notice, which are quoted in full in the opinion;) that on the 20th of said June, plaintiff tendered to said treasurer the further sum of $1,326.94, being the balance of personal tax legally and properly due after credit being given for said sum of $2,281.08 paid on 14th December 1874, but said treasurer refused to so receive the same, and demanded instead the further sum of $2,281.08, in addition to the like sum previously paid, which latter sum the plaintiff declined to pay; and that on August 18th 1875, said treasurer issued his precept to said sheriff, one of the defendants, to collect said sum of $2,281.08, and the penalty alleged to have accrued thereon, and said sheriff is about to execute said precept by seizure and sale of the property of said plaintiff, etc. Upon this petition, which was duly verified, plaintiff applied to the district judge, at chambers, for a temporary injunction. Notice of such application was given to defendants. Said application was heard on the 21st of August 1875. The district judge refused the injunction, and plaintiff appeals, and brings the case here on error.

*J. P. Usher,* and *C. E. Bretherton,* for plaintiff.

*H. L. Alden,* county-attorney, for defendants.

The opinion of the court was delivered by

BREWER, J.: The first question in this case is, upon the construction to be given to the railroad tax-law of 1874. By the plaintiff in error it is claimed, that the valuation returned by the company is to be accepted as the proper valuation, subject to correction after notice, as provided in § 65 of the general tax-law, (Gen. Stat., p. 1041.) On the other hand it is claimed that the valuation is to be made by the city and township assessors. The question hinges in the first instance on the construction to be given to § 7, which reads as follows:

SEC. 7. The county clerk shall return to the assessor of the county or city a copy of the schedule or list of the railroad-track, and other real estate, and of the rolling-stock and other personal property pertaining to the railroad; and such railroad-track and other real estate, rolling-stock and other personal property, shall be assessed by the city and township assessors. *Such property shall be treated in all respects in regard to assessment and equalization the same as other property belonging to individuals,* except that it shall be treated as property belonging to railroads, under terms "lands," "railroad-track," "lots," and "personal property."—(Laws of 1874, p. 149.*)

Now if the sentence which declares that the rolling-stock, etc., shall be assessed by the city and township assessors, controls, and refers specifically to the *valuation* of the property, then the contention of the defendant in error must be sustained. If on the other hand the clause in italics controls, we must turn to the general tax-law, and if under it the valuations placed upon their personal property by individual owners are conclusive, unless corrected by proper proceedings, then in like manner the valuation made by the company must be taken as conclusive. The question is one of difficulty. Indeed, it seems impossible to adopt any construction which will give full force to every clause in the section. Perhaps it will throw light on the matter if we examine the general tax-law, and see what rule obtains in it, and what are the provisions for securing to the state a correct tax-list, and at

[*THIS section, and §§ 2, 3, 4, 5, 6, and 11, of the same act, were amended by chapter 123, Laws of 1875.—Laws of 1875, pp. 185, 187.]

the same time protecting the property-owners against excessive valuations. As to real estate, the law is plain. Sec. 31 declares that it shall be the duty of the county assessor to list and value all the real property in his county. By § 43, the county board is ordered to meet on the first Monday in July to equalize the valuation of the real estate. By § 44, notice of this meeting is to be given, so that "all persons feeling themselves aggrieved can appear and have all errors in the return corrected, as justice and equity may demand." Here then, is what seems a fair and reasonable provision for protecting both the state and the taxpayer. In the first place, the state, through its officer, and without consultation with the taxpayer, determines the value of the property, and then provides a tribunal, public notices of whose meetings must be given, before which any property-holder may appear and make such showing as he desires, to have any error in the valuation of his property corrected. As to personal property, the law is not so plain—at least it is not stated so directly and positively as in the case of real estate. Still, an examination of the various sections will, we think, make clear the rule as to personal property. In the first place, there is no board of equalization of personal property, no tribunal before which the injured property-holder may come and have his assessment reduced. But on the other hand, we find provision made for the state to correct any errors made by the individual. Section 65 reads as follows:

"SEC. 65. The county clerk or board of county commissioners, if he or they shall have reason to believe, or be informed, that any person has given to the assessor a false statement of his personal property, moneys, or credits, investments in bonds, stocks, joint-stock companies or otherwise, or that the assessor has not returned the full amount required to be listed in his ward or township, or has omitted or made an erroneous return of any personal property, moneys or credits, investments in bonds, stocks, joint-stock companies or otherwise, which are by law subject to taxation, shall proceed, at any time before the final settlement with the county treasurer to correct the return of the assessor, and to charge such person on the duplicate with the proper amount of

taxes; to enable him to do which, he is hereby authorized and empowered to issue compulsory process, and require the attendance of any person or persons whom he may suppose to have a knowledge of the value of such articles of personal property, moneys or credits, investments in bonds, stocks, or joint-stock companies, or otherwise, and examine such persons on oath or affirmation in relation to such statement or return; *and it shall be the duty of the clerk in all such cases, to notify such person, before making entry on the duplicate, that he may have an opportunity of showing that his statement or return to the assessor was correct;* and the county clerk shall in all cases, file in his office a statement of the facts or evidence on which he made such correction; but he shall in no case reduce the amount returned by the assessor, without the written consent of the state auditor, given on a statement of facts submitted by the county clerk."

Here it is the false statement of the individual, or the omission of the assessor, that is to be corrected, matters almost necessarily prejudicial to the state, and beneficial to the individual. And that this is not for the benefit of the individual, is made more clear by the provision that there shall be no reduction without the written consent of the state auditor, given on a statement of facts submitted by the county clerk — a proceeding too cumbersome to be of any practical value to the individual. Referring to the earlier portions of the tax-law, we find that the individual is required to return under oath a statement of his personal property and its value. Sec. 10 is as follows:

"SEC. 10. Every person required by this act to list property, shall make out and verify by his oath, and, at any time after ten days from the time of receiving notice to that effect from the assessor, shall deliver to said assessor, on demand, a statement of all personal property, *and the value thereof,* which by this act he is required to list." * * *

Section 15 gives the rules for the valuation of property. In speaking of real estate, it refers to the "assessor" as the party fixing the value. But as to personal property, it says in one place, "the person required to fix the value thereon;" and in another, "at such prices as the person listing believes them to be worth." Sections 17, 18 and 21, define merchants

and manufacturers, and how the value of their property shall be ascertained for taxation; and in them it is provided, that "he (the merchant or manufacturer) shall estimate" the value, etc. Sec. 29, which in terms applies to most corporations, provides that certain officers thereof shall under oath return to the county clerk the various items of their property, and the value thereof; and this value stands unless the county clerk believes that false or incorrect returns have been made, when he can correct the return as in § 65. The assessor has apparently nothing to do with these returns. By § 53, a blank for his statement of taxable property is required to be left with every taxpayer. By § 57, wherever the taxpayer fails to make return, or refuses to swear to his return, the assessor may proceed to ascertain the property, and its value, and may call witnesses and examine them, and from such examination determine the amount and value of his property. By § 60, if the taxpayer was absent when the assessor was collecting his returns he may thereafter go before the county clerk and make his statement under oath, and the county clerk is to correct the returns by that statement, thus making the valuation of the individual to correct the valuation of the officer. The assessor is required to make oath that he has returned the value given by the taxpayer, as appears from § 63 as follows:

"Sec. 63. The assessor, when making his returns of personal property, shall take and subscribe an oath, which shall be certified by the officer administering the same, and attached to the return which he is required to make, which shall be in the following form: 'I, ————, assessor for ———— township, in the county of ————, do solemnly swear that the value of all personal property, * * * for which a statement has been made to me, by the person required by this act, for the assessment and taxation of all property in this state, according to the true value, to list the same, is hereby returned as set forth in such statement.'"

And by § 64 it is made the duty of the county clerk to add to the valuation returned, when the owner refused to swear to the value, fifty per centum on the value returned. Other

sections might be cited, all pointing in the same direction. But these are sufficient. They make it clear, that the rule as to personal property differs from that as to real. In the former, the individual fixes the value, and that value controls unless the state, dissatisfied therewith, takes measures to correct it; and these measures, as already decided by this court, require notice to the individual. *Leavenworth Co. v. Lang*, 8 Kas. 284. In this way are the rights of the individual and state both secured. The individual giving the value, of course does himself no injustice; and the state is given the right to inquire into that value, summon the individual before a tribunal, present testimony, and have any errors corrected. It may be well, before passing from this subject, to notice the change made by the law of 1876, (Laws of 1876, p. 59, § 14; p. 71, § 59; p. 77, § 74,) by which it would seem that the owner's valuation is no longer conclusive, and that the board of equalization has jurisdiction as to personal as well as real property.

With this consideration of the general tax-law, let us now return to the railroad tax-law. And first, we remark that if there be no way of reconciling the conflicting clauses, force ought to be given to those which would place this law in harmony with the general tax-law, and would secure the rights of both the state and the railroads, rather than to those which would make this incongruous and out of harmony with other legislation, and would expose the railroads to arbitrary and excessive assessments, without adequate means of investigation and redress. Now, § 7 heretofore quoted, reads, that a schedule of all the property real and personal, naming the classes as they are described in the act, shall be returned by the clerk to the assessor, and that he shall assess all, and then, that all proceedings respecting assessment and equalization shall be in harmony with the general tax-law. Counsel for the county would harmonize these two seemingly conflicting provisions by adding to the last some expression like this —"except as heretofore provided." Counsel for the company would harmonize them by construing the two together to mean,

that the assessor shall assess railroad property as he assesses individual property—that is, placing his own judgment upon the value of the real, and accepting the owner's statement as to the value of the personal. And this, we are constrained to hold, is the true construction. The assessor is spoken of as such, even in reference to personal property, though as to that, as we have seen, he is to accept the owner's statement as to the value; and there is no greater impropriety in the use of language to say, that he shall assess the real and personal property, when it is intended that he shall as to the latter property accept as conclusive the statement of the owner as to value. A somewhat similar use of language is found in the amendment of 1869, vesting the duties of the county assessor in the township assessors. (Laws 1869, p. 241.) It reads:

"SEC. 31. It shall be the duty of the *township* assessor in each year to list and value all the real *and personal* property in his *township* not expressly exempted from taxation.

"SEC. 33. The assessor shall from actual view, and from the best sources of information within his reach, determine as nearly as practicable the true value of all taxable property within his *township*, according to the rules prescribed by this act for valuing property."

Unless this be the true construction, the legislature must be held to have excepted railroads from the ordinary rules of taxation, and while making, as to all other property, reasonable provision for protecting the rights of both the state and the individual, and providing a tribunal before which the party likely to suffer injustice may produce his evidence, and establish his rights, it has placed it in the power of one man, arbitrarily, and without consultation, to place a value for taxation upon the personal property of railroads from which there is no appeal, and against which there is, except in cases of fraud, no remedy. It secures a tribunal of revision as to real, but not to personal property; for while the state board may equalize the railroad assessments, it cannot reduce the total assessment. (Laws of 1874, p. 150, § 10.) It carves out an exception not merely as to railroads, but as to certain kinds

of railroad property. Again, as further evidence of the intention to harmonize railroad assessments with those of other property, it is provided in § 9 of this act—

"If any person, company or corporation * * * shall neglect to return to the county clerk the statements or schedules, * * * the property so to be returned shall be listed and assessed as other property by the city and township assessors."

Without pursuing the argument further, we hold that under the law of 1874, the same rule obtains in reference to railroad as in reference to other property, and no proceedings having been had in this case under § 65 of the general tax-law to correct the valuation made by the company, that valuation will control.

We pass now to the second question, the effect of a payment of a tax under protest. The facts in respect thereto appear in this extract from the petition and the exhibit thereto attached:

"One-half of said taxes became due on the 20th of December 1874; and on the 14th of December 1874, John P. Devereux, as agent for the plaintiff, tendered the treasurer of the said county the sum of $1,804.01, being one-half of said personal tax legally and properly payable by plaintiff, which sum said treasurer refused to receive. Thereupon, to avoid the issue of legal process for collection of such excessive tax, and under protest, said John P. Devereux paid the full amount of said tax as it appears on the tax-roll as then due, namely, $2,281.08, and filed the protest of the plaintiff against the illegality thereof with said treasurer, a copy whereof is hereto annexed, marked 'A.'

"PROTEST 'A.'—*To the Treasurer of the County of Wyandotte, State of Kansas:* The Kansas Pacific Railway Company hereby notify you that the amount legally due by said company as one-half tax on the personal property in your county, due December 20th 1874, does not exceed the sum of $1,804.01, which sum you have refused to receive; and that said company pay the sum of $2,281.08, demanded by you, protesting against the illegality thereof, and solely to avoid the issue of legal process for its collection; and said company further notify you that they will hold you and your county liable for

the excess above the amount legally due. That you are not to disburse or part with such excess, and that said company will sue you and said county for its recovery.

*Dated* 14th December, 1874.

THE KANSAS PACIFIC RAILWAY COMPANY,
*John P. Devereux, Agent, Duly Authorized.*"

Under § 4 of chapter 131, laws 1874, the county treasurer was directed to issue a warrant for all taxes on personal property due and unpaid on the first day of January. So that if the company had not paid before that time, it would have been the duty of the county treasurer to have issued his warrant against it, which warrant would have had all the force and effect of an execution. Was the payment voluntary? In the case of *Wabaunsee County v. Walker,* 8 Kas. 436, which was a case involving the question of voluntary or involuntary payment, this court says: "A correct statement of the rule governing such cases as this would be as follows: Where a party pays an illegal demand with a full knowledge of all the facts which render such demand illegal, without an immediate and urgent necessity therefor, or unless to release his person or property from detention, *or to prevent an immediate seizure of his person or property,* such payment must be deemed to be voluntary, and cannot be recovered back. And the fact that the party at the time of making the payment filed a written protest, does not make the payment involuntary." We see no reason to doubt the correctness of the rule as thus stated. Was this a payment to prevent an immediate seizure of the property of plaintiff in error? If the warrant had actually been issued by the treasurer, and in the hands of the sheriff, who was demanding payment and threatening seizure, there would be no question, for in the language of the supreme court of Massachusetts, in *Boston Glass Co. v. Boston,* 4 Metc. 181, the warrant "is in the nature of an execution running against the property of the party, upon which he has no day in court, no opportunity to plead and offer proof, and have a judicial decision of the question of his liability." But here no warrant had issued. None could

legally issue for seventeen days, nor could the company's property be in any manner disturbed before that time — so that there was no danger of instantaneous seizure. On the other hand, there was no further inquiry to be made by any officer or tribunal. The amount of the tax was fixed beyond any opportunity for review. There was no discretion with any one, as to whether a warrant should or should not issue, a levy should or should not be made. The machinery for adjusting the amount of the tax had completed its work, and was at rest; only the machinery for collecting was in motion, and it moved with the certainty of fate, and the rapidity of time to the finality of seizure and sale. Where the law is imperative, and, giving no discretion, commands the issue of the warrant at a definite time, and the levy under that warrant within a fixed time thereafter, must an individual wait until the last moment, and pay only just as the officer is seizing his property, or may he assume that the officers of the law will obey its precepts, and when all opportunity for consideration, correction, and change has passed, all discretion ended, and the tax-roll is in the treasurer's hands, waiting only the lapse of a few days to ripen into a warrant and seizure, may he not then pay to the treasurer, protesting against the legality, and asserting his intention to contest? Does he not then pay to prevent an immediate seizure, one that is certainly and presently impending? Wherein does the state suffer wrong, or what advantage does it lose by holding that to be an involuntary payment? It is not a case "where a party can only be reached by a proceeding at law," as suggested in *Mays v. Cincinnati*, 1 Ohio St. 268, in which "he is bound to make his defense in the first instance, and he cannot postpone the litigation by paying the demand in silence and afterward suing to recover back." In New York, the case of *Bailey v. Buell*, 59 Barb. 158, is in point. In that case the assessor obtained an order from the county judge that plaintiff should pay the amount of tax in dispute, or execution would issue against him. On being served with a copy of the order, but without any exe-

cution being issued, plaintiff paid the amount. It was held an involuntary payment, and the tax being illegal the party could recover. In *Union Bank v. New York*, 51 Barb. 159, the trial court held that payment of an illegal tax, under a notice from the receiver of taxes that unless paid a penalty would be imposed by way of interest, and a warrant would be issued, was a voluntary payment. The commission of appeals, 51 N. Y. 638, held that such payment was *not* voluntary, and reversed the decision, following *Bank of Commonwealth v. The Mayor*, 43 N. Y. 188. In that case, Grover, J., said, "While that [the assessment] remained in force, the tax founded thereon had the force of a judgment, requiring the plaintiff to pay the tax as required by statute. The plaintiff was legally bound so to pay, and had no lawful mode of resisting such payment. In such a case, the only resistance to the requirement of the officer charged with the collection for payment, if that could have been made, would only subject the plaintiff to further expense, and would have been entirely abortive. Under such circumstances the plaintiff had the right to pay, without affecting its right to recover back the money, should the tax thereafter be determined illegal by a revisal of the assessment on which it was founded. The payment was not voluntarily made, but coerced by the law, which obliged the plaintiff to make it." In Massachusetts, in *Boston Glass Co. v. Boston*, 4 Metc. 181, (cited in *Wabaunsee Co. v. Walker*, supra,) it is held that "payment of taxes to a collector who has a tax-bill and warrant in the form prescribed by law, is to be regarded as compulsory payment, and if such taxes were assessed without authority, they may be recovered back in an action for money had and received, although the party made no protest before payment." An examination of the facts in that case will show that no execution or final process for collection had been issued, but that payment was made on the tax-bills, a species of formal demand for payment. This case follows *Preston v. Boston*, 12 Pick. 7, where it is held, "if a person pay an illegal tax *in order to prevent the issuing of a warrant* of distress with

which he is threatened, *and which must issue of course unless the tax is paid,* the payment is to be deemed compulsory, and not voluntary." In *Grim v. School District,* 57 Penn. St. 434, it is said to be settled law, that "A party who, when threatened with a distress, pays an illegal tax under protest and notice of suit, may maintain an action to recover it back." See also, *Henry v. Horstick,* 9 Watts, 414. In *Allen v. Burlington,* 45 Vermont, 202, the court says: "If the plaintiff was constrained to pay the tax to save his property from distress and to avoid a penalty and costs, it was not a voluntary payment. (*Babcock v. Granville,* 44 Vt. 326; *Henry v. Chester,* 15 Vt. 469.) It is not necessary that the warrant should have been issued, and the levy instant. If he expected and had a right to expect that in due course the warrant would issue, and the collection be enforced with costs, and that unless he complied with the one alternative he must submit to the other, and he paid, because otherwise the other alternative would be upon him, with protest that he paid because thus constrained, it is not such voluntary payment that he would be precluded from recovering back the taxes so paid, if they were illegally imposed."

It seems to us, then, that according to a fair and reasonable interpretation of the rule, the railway company paid this first half of the tax under such circumstances that it should be considered an involuntary payment. It was to prevent a seizure as certainly impending as the law could make it, and one also presently impending. It may be remarked that the entire personal tax was levied and assessed as one tax. The law simply divided the time of payment, requiring one-half to be paid in December, and permitting the other to remain until the June following, so that if more than the one-half was paid in December, there would be some show of reason in holding that it might be corrected when the last half of the same tax was to be paid.

We see no other question in the case necessary for consideration. The ruling of the district judge will be reversed, and the case remanded with instructions to grant a tempo-

rary restraining order, upon the giving of a proper and sufficient bond.

KINGMAN, C. J., concurring.

VALENTINE, J.: I concur in what is stated in the first four propositions of the syllabus, and in what is stated in the corresponding portions of the opinion. But I express no opinion with reference to the rest of the syllabus, or the opinion. And I express no opinion as to what judgment should be rendered, or order made in this case.